FILED
2015 Oct-06  PM 02:45
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| ANTONIO CAMPBELL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 2:14-cv-00623-JEO |
| | ) | |
| UNITED OF OMAHA LIFE | ) | |
| INSURANCE COMPANY and J&B | ) | |
| IMPORTERS WELFARE PLAN, | ) | |
| | ) | |
| Defendants. | ) | |

## <u>MEMORANDUM OPINION</u>

This case arises out of the denial of plaintiff Antonio Campbell's claims for
short-term disability ("STD") and long-term disability ("LTD") benefits under
group disability insurance policies issued by United of Omaha Life Insurance
Company ("United of Omaha") to Campbell's employer, J&B Importers, Inc.
("J&B").   The policies constitute the J&B Importers Welfare Plan (the "Plan"), an
employee welfare benefit plan governed by the Employee Retirement Income
Security Act of 1974, 29 U.S.C. § 1001 *et seq.* ("ERISA").   After his claims for
disability benefits were denied, Campbell filed this ERISA action against United of
Omaha and the Plan (collectively, the "Defendants"), asserting claims for
reinstatement and payment of benefits under 29 U.S.C. § 1132(a)(1)(B) (Count I),
breach of fiduciary duty under 29 U.S.C. §§ 1104 and 1110 (Count II), and failure

1

to provide documents under 29 U.S.C. § 1132(c) (Count III).  (Doc.[1] 1).  In an earlier order, the court granted the Defendants' motion to dismiss the claims for breach of fiduciary duty and failure to provide documents, leaving only Campbell's claim for benefits.  (Doc. 14).

The case is now before the court on three motions: (1) the Defendants' motion for judgment on the ERISA administrative record or, in the alternative, motion for summary judgment (doc. 20); (2) Campbell's cross-motion for summary judgment (doc. 23); and (3) the Defendants' motion to exclude certain exhibits and portions of Campbell's response brief (doc. 32).  For the reasons stated below, the court concludes that the Defendants' motion for summary judgment is due to be granted in part and denied in part, that Campbell's motion for summary judgment is likewise due to be granted in part and denied in part, and that the Defendants' motion to exclude is also due to be granted in part and denied in part.

---

[1]References to "Doc. __" are to the document numbers assigned by the Clerk of the Court to the pleadings, motions, and other materials in the court file, as reflected on the docket sheet in the court's Case Management/Electronic Case Files (CM/ECF) system.

# I.  FACTS

## A.    The Disability Policies

Effective January 1, 2007, United of Omaha issued group short-term and long-term disability policies to J&B.  (R.[2] 1-53, 305-61).  The policies provide benefits to eligible J&B employees who become "Totally Disabled or Partially Disabled due to Injury or Sickness."  (R. 36, 336).   Under the STD policy, "Total Disability and Totally Disabled" means that "because of an Injury or Sickness, a significant change in Your [(the employee's)] mental or physical functional capacity has occurred in which You are prevented from performing all of the Material Duties of Your Regular Job on a full-time basis."[3]  (R. 15, 52).   "Regular Job" is defined as "the occupation You are routinely performing when Your Total or Partial Disability begins."  (R. 52).  "Material Duties" are defined as "the essential tasks, functions, and operations relating to Your Regular Job that cannot be reasonably omitted or modified. … One of the material duties of Your Regular Job is the ability to work for an employer on a full-time basis."  (R. 51).

---

[2] References to "R. __" are to the page numbers of the administrative record, which the Defendants filed under seal.  The administrative record is located at Docs. 25-1 through 25-6. The pages of the administrative record are stamped "UNITED-" followed by a six-digit numeral, *e.g.*, "000001."  When cited herein, however, pages in the administrative record do not include the "UNITED-" identifier or the leading zeros.  Thus, for example, the page stamped "UNITED-000001" is cited simply as "R. 1."

[3] Campbell is not seeking benefits for partial disability.

The LTD policy contains similar definitions.  The LTD policy contains the same definitions of "Total Disability and Totally Disabled" and "Material Duties" as the STD policy, except that the LTD policy refers to the employee's "Regular Occupation" instead of "Regular Job."   (R. 318, 353, 355).   "Regular Occupation," like "Regular Job," is defined to mean "the occupation You are routinely performing when Your Total or Partial Disability begins," but the LTD policy further explains that "Your regular occupation is not limited to the specific position You held with the Policyholder, but will instead be considered to be a similar position or activity based on job descriptions included in the most current edition of the U.S. Department of Labor Dictionary of Occupational Titles (DOT)."  (R. 354).

The STD policy has a 44-day elimination period, and benefits are payable for a maximum of 7 weeks or until benefits become payable under the LTD policy, whichever occurs first.  (R. 26-27).  The LTD policy has an elimination period of 90 days or the date STD benefits end, whichever is sooner.  (R. 324).  The maximum period for the payment of LTD benefits depends on the employee's age at the onset of disability.  (R. 325).  Both policies provide that the payment of benefits will end on the day an employee is no longer Totally or Partially Disabled. (R. 36, 337).

J&B is the Plan Administrator.  (R. 47, 349).  J&B has delegated discretionary authority to United of Omaha to make benefits determinations under both the STD policy and the LTD policy.  The STD policy provides that J&B has delegated to United of Omaha "the discretion to determine eligibility for benefits and to construe and interpret all terms and provisions of the Policy."  (R. 10). Similarly, the LTD policy provides that J&B has granted United of Omaha "the discretion and the final authority to construe and interpret the policy."  (R. 310). Each policy expressly provides that benefits will be paid "only if [United of Omaha] determine[s], in [its] discretion, that the claimant is entitled to benefits under the terms of the Policy."  (R. 41, 343).   United of Omaha's discretionary authority to make benefits determinations is also described in the Summary Plan Description for each policy.  (R. 49, 351).

## B.    Campbell's Short-Term Disability Claim

Campbell began working at J&B on June 1, 1992.  (R. 292).  He was employed as an "inside salesman" and managed J&B's telemarketing program. (*Id.*)  His duties included initiating and answering sales calls and occasionally checking on orders in the warehouse.  (R. 293).  According to J&B, Campbell's job fell in the "light" category of physical work, requiring him to lift a maximum of 20 pounds and to frequently carry and lift up to 10 pounds.  (R. 292).

In January 2012, Campbell submitted an application for STD benefits to United of Omaha. (R. 290-93). He applied for benefits beginning November 18, 2011, due to a disability resulting from a stroke he suffered at work the day before. (R. 290). Campbell's internist, Dr. Todd Schultz, completed the "Attending Physician's Statement" for the application on January 20, 2012. (R. 284-85). Dr. Schultz reported that Campbell had been continuously disabled (unable to work) since November 17, 2011, but should be able to work in three to six months. (R. 284). He noted that Campbell could constantly lift and carry up to five pounds, occasionally lift and carry up to 25 pounds, sit for 30 minutes at a time, and stand and walk for 15 minutes at a time. (R. 285). He further noted that Campbell's judgment was fair, that his ability to deal with work stresses was guarded, that his concentration and attention span were fair, and that his overall prognosis was guarded. (R. 284).

By letter dated January 24, 2012, United of Omaha notified Campbell that it had received his application for STD benefits and was in the process of reviewing his claim. (R. 275). The letter was signed by Julie Shahan, "Group Insurance Claims Management." (*Id.*) Shahan is employed by United of Omaha's parent company, Mutual of Omaha Insurance Company ("Mutual of Omaha"). (Doc. 24-5 (United of Omaha's Answers to Plaintiff's Interrogatories) at 6).

The next day, United of Omaha sent Campbell a second letter, advising him that it had approved the payment of STD benefits for the period from January 1, 2012 (the date his 44-day elimination period ended) through January 23, 2012.  (R. 269).  United of Omaha further advised Campbell that "[i]n order to properly review your claim to determine if additional benefits can be allowed, we are requesting information from your physician."  (*Id.*)  As before, the letter was signed by Shahan.  (*Id.*)

Over the next three months, United of Omaha obtained records from Dr. Schultz, Dr. Brian Adler (a consulting hematologist), and Dr. Camilo Gomez (Campbell's neurologist).  (R. 138-50, 178-81, 184-200, 233-34).  Included were records from Brookwood Medical Center ("Brookwood"), where Campbell was admitted by Dr. Gomez following his stroke on November 17, 2011.  (R. 140-150). While at Brookwood, Campbell underwent multiple imaging studies of his head and neck.  (R. 143-46).  A CT scan of his head revealed "a tiny area of decreased attenuation in the white matter of the left frontal lobe that may be an evolving ischemic infarct" but "[n]o other abnormalities."  (R. 143).  An MRI of his head showed "multiple hyperintense foci involving the cerebral white matter with a few interval developing lesions from [a previous] MRI of 5/3/2010."  (R. 144).  An MRA of Campbell's head was "within normal limits" and revealed "no MRA evidence of intracranial aneurysm."  (R. 145).  An MRA of his neck revealed "no

significant stenosis involving the carotid arteries" and "unremarkable" vertebral vessels. (R. 146). Campbell also underwent an electroencephalogram, which was normal. (R. 148). Campbell was discharged from Brookwood on November 22, 2011, with a diagnosis of "[a]cute bilateral cerebral infarctions, embolic." (R. 140).

Dr. Schultz's records included his notes from Campbell's office visits on November 10 and 30, 2011, December 20, 2011, and February 28, 2012. (R. 178-200). All of the visits were "follow-up" visits. On November 10, 2011—one week before his stroke at work—Campbell complained of problems with neck and back pain and restless legs. (R. 197). On November 30, 2011, his chief complaint was back pain, and he reported some numbness in his arms and the left side of his face since his stroke. (R. 193). On December 20, 2011, Campbell's chief complaint was "getting tired easy." (R. 189). On February 28, 2012, he requested that his blood pressure medications be combined, and complained of fatigue and shortness of breath. (R. 178). At all four visits, Dr. Schultz noted that Campbell's "[s]troke syndrome" was being "[f]ollowed by Dr. Gomez." (R. 181, 191, 195, 199). He also noted at each visit that Campbell appeared "normal" and "alert," that he had no neurological symptoms, and that his neurological system was grossly intact. (R. 179-80, 190-91, 194-95, 198-99).

8

United of Omaha also obtained a copy of a Family and Medical Leave Act certification form that Dr. Schultz completed for Campbell on January 17, 2012, two months after his stroke at work.  (R. 399-400).   On the form, Dr. Schultz reported that Campbell was unable to perform "all … job functions listed," which included answering and initiating sales calls and heading J&B's telemarketing program.  (R. 299-300).  He also indicated that Campbell would be incapacitated for a single continuous period of time due to his condition, and commented that Campbell "experiences debilitating side effects that prevent efficient work productivity."  (R. 300).

Dr. Adler examined Campbell on January 11, 2012, at the request of Dr. Schultz.  (R. 233-34).  Dr. Adler noted that Campbell was first diagnosed with strokes in 2010 and that "MRIs revealed evidence of prior multiple strokes bilaterally."  (R. 233).  He further noted that Campbell underwent evaluation during his hospitalization in November 2011, which included "MRI/MRA of the brain, MRA of the neck, [and a] transesophageal echocardiogram, all of which were normal."  (*Id.*)  Dr. Adler observed that there was "no evidence of either vascular defects or a shunt" and that there was "no obvious etiology for [Campbell's] recurrent TIAs [(transient ischemic attacks)]."  (R. 233-34).

 Dr. Gomez examined Campbell on March 12, 2012.  (R. 138-39).  Dr. Gomez initially noted:

> Since the last time he was seen, several months ago, this patient has continued to experience difficulties with his mental performance. In particular, it is noted that his memory is decreased and that he has difficulty of following up complex tasks. He is also having significant difficulties with anxiety related to the fact that his insurance doesn't seem to be willing to pay for his disability, which appears quite evident.

(R. 138). Dr. Gomez further noted that Campbell, "having suffered multiple cerebral infarctions in the past, is very likely [o]n the verge of developing some form of vascular dementia." (R. 139) Dr. Gomez concluded: "Although it is early, I think it is reasonable to consider this problem, particularly as it affects his ability (or inability) to work again. In my opinion, I think he is disabled but I think additional evidence is warranted." (*Id.*) Dr. Gomez referred Campbell for neuropsychological testing. (*Id.*)

United of Omaha submitted Campbell's medical records for internal review by a nurse. (R. 742-51). Sara Schmit, a case management nurse employed by Mutual of Omaha, reviewed the records and determined that the restrictions and limitations outlined by Dr. Schultz in his Attending Physician's Statement would not preclude Campbell from work activities. (R. 744). She also recommended obtaining Campbell's neuropsychological testing results. (R. 751).

On March 26, 2012, United of Omaha issued a letter, again signed by Julie Shahan, denying STD benefits to Campbell beyond January 23, 2012. (R. 128-31). In the letter, United of Omaha informed Campbell of its determination that the

information it had received from Drs. Schultz, Gomez, and Adler "does not support

your inability to perform the material duties of your job as an inside salesman

beyond January 23, 2012." (R. 129). United of Omaha advised Campbell of his

right to submit a written appeal of the claim decision, and specified that it was

"essential" for Campbell to provide neuropsychological testing results with his

appeal. (*Id.*)

## C.     Campbell's Neuropsychological Testing

On March 28, 2012, two days after United of Omaha issued its denial letter,

Dr. Thomas Boll performed a neuropsychological examination of Campbell. (R.

100-102). Dr. Boll is certified in clinical neuropsychology by the American Board

of Professional Psychology. (R. 100). Based on his examination of Campbell, Dr.

Boll determined:

> From a neurocognitive point of view Mr. Campbell does have good
> abilities in a number of areas including those reflective of past skills
> and knowledge and language functioning. He has obvious impairment
> in his motor system and his executive system and a somewhat milder
> impairment in his memory system. This is consistent with an
> individual who has had multiple strokes. His major complaints
> however involve his physical concern, exhaustion, lack of stamina and
> generalized difficulty in carrying out activities of other than a
> relatively brief nature. He does however have sufficient
> neurocognitive difficulties to make it unlikely that he will be able to
> return to work in his former position.

(R. 101).

Campbell had a follow-up visit with Dr. Gomez on April 4, 2012, to discuss the results of his neuropsychological testing.  (R. 649-52).  In his progress notes, Dr. Gomez commented that Campbell "continues to have difficulties with his thinking and continues to have difficulties with his disability benefits."  (R. 649). With respect to the neuropsychological testing results, Dr. Gomez remarked:

> The neuropsychological testing shows factual evidence that the patient has deficits of a neurologic nature [that] will likely prevent him from going back to work.  This is exactly as we suspected.  Furthermore, there is a significant component of depression that needs to be addressed and as such, I would make a referral for this patient to be seen by a psychiatrist.

(R. 650).

Dr. Boll's report and Dr. Gomez's progress notes were provided to United of Omaha.  Two nurses, both employed by Mutual of Omaha, reviewed the records. (R. 755-61).  Nurse Kathy Rath-Fischer concluded that "the new information would not support a cognitive impairment that would preclude [Campbell from] working."  (R. 756).  Nurse Robin Shaver determined that restrictions and limitations in Campbell's ability to work were not supported, stating that "Dr. Boll's report is not clear and does not support 'sufficient neurocognitive difficulties to make it unlikely that [Campbell] will be able to return to work in his former position.'"  (R. 760).

**D.      Campbell's Long-Term Disability Claim**

On May 25, 2012, attorney Kristi Dowdy submitted Campbell's application for LTD benefits.  (R. 63-73).  In his application, Campbell again represented that he was unable to work due to the stroke he suffered at work on November 17, 2011.  (R. 64).  Dr. Schultz again completed a "Physician's Statement" as part of the application process.  (R. 72-73).  Dr. Schultz reported a diagnosis of "stroke syndrome" with symptoms of "memory impairment and paresthesia."  (R. 72).  He noted that "at this point [Campbell's] symptoms are permanent" and that Campbell's prognosis for recovery was "unknown at this time."  (R. 73).

By letter dated June 6, 2012, United of Omaha acknowledged receipt of Campbell's application for LTD benefits.  (R. 674).  United of Omaha advised Campbell that it needed to obtain additional information from J&B and from his physicians in order to render a decision on his claim.  (*Id.*)  The letter was signed by Teresa Strong-Hilger, "Group Insurance Claims Management."  (*Id.*)  Strong-Hilger is an LTD claim analyst employed by Mutual of Omaha.  (Doc. 24-5 at 6).

United of Omaha subsequently obtained additional medical records from Dr. Schultz and Dr. Gomez.[4]  Dr. Schultz's records included his notes from a follow-up visit with Campbell on April 4, 2012.  (R. 548-51).  Dr. Schultz noted that

_____

[4] Dr. Gomez's records consisted of his notes from Campbell's visit on April 4, 2012, following Campbell's neuropsychological testing, which records had previously been provided.  (R. 649-52).

13

Campbell had been seen at a diabetes center since his last visit but that otherwise Campbell was "doing well" and denied any new complaints.  (R. 548).  Dr. Schultz also provided notes from his physical examination of Campbell on May 10, 2012.  In those notes, Dr. Schultz remarked that Campbell had been "doing about the same" since his last visit but that he "continues to have problems with memory, as well as some numbness in his left and right arm that has been attributed to his recent stroke."  (R. 543).   In both sets of notes, Dr. Schultz continued to note that Campbell appeared normal and alert, that his stroke syndrome was being followed by Dr. Gomez, that he had no neurological symptoms, and that his neurological system was grossly intact.  (R. 544-46, 549-50).

All of Campbell's medical records were reviewed by nurse Julie Grancer, another Mutual of Omaha employee, on July 16, 2012.  (R. 762-66).  Grancer concluded that "the available Medical Records fail to reveal a significantly impairing medical condition warranting [restrictions and limitations]" in Campbell's ability to work.  (R. 766).

By letter dated July 16, 2012, signed by Strong-Hilger, United of Omaha advised Campbell that it was denying his claim for LTD benefits, stating: "Mr. Campbell, your file currently lacks sufficient evidence to support the basis for restrictions and limitations that would preclude you from performing your

14

sedentary occupation as a[n] Inside Salesman…. In summary, the current available medical records fail to substantiate the need for restrictions and limitations that preclude you from performing the Material Duties of your Regular Occupation." (R. 518-23).  United of Omaha again informed Campbell of his right to submit a written appeal of the claim decision.  (*Id.*)

**E.     Campbell's Appeal of the Claim Denials**

On September 17, 2012, attorney Larry Knopf submitted Campbell's written appeals of the denials of his claims for STD and LTD benefits.  (R. 511-13).  One week later, attorney Kristi Dowdy also requested "an appeal of the denial of Mr. Campbell's short-term disability benefits and … a status update of his application for long-term benefits."  (R. 508).

Over the course of the next several months, United of Omaha sent letters to Dowdy, Campbell, and Knopf identifying the medical documentation in its file and noting that the most current treatment notes in the file were dated May 10, 2012, from Dr. Schultz.  (R. 493-94, 501-02, 505-06).  United of Omaha's letters were all signed by Bobbi Burns-Bierwith, "Group Insurance Claims Management."  Burns-Bierwith is an appeals specialist employed by Mutual of Omaha.  (Doc. 24-5 at 6). In its letters, United of Omaha requested "medical records dated May 11, 2012, to the current date, as well as any other medical documentation not previously considered," in order to perfect the appeal.  (*Id.*)

15

By letter dated April 4, 2013, also signed by Burns-Bierwith, United of Omaha notified Knopf that it had not received any additional medical documentation and that "[a]s the file stands, we would be unable to change our prior decision." (R. 454-55). As a result, United of Omaha exercised its right to extend the time to render a decision on Campbell's appeal. (R. 454). That same day, Knopf finally responded to United of Omaha's request and provided additional medical records from Dr. Gomez and records from Grayson & Associates, a mental health care provider. (R. 482-91). Knopf provided more medical records on April 26, 2013, including records from Dr. Gomez and from Dr. Schultz. (R. 414-28).

The records from Dr. Gomez consisted of his progress notes from his examination of Campbell on October 4, 2012. Dr. Gomez commented that "[s]ince the last time he was seen, approximately 6 months ago, this patient has been doing better than before. [He] is going to a psychiatrist and is being treated. [He] feels that he is doing better with the treatment [than] he was before." (R. 415). Dr. Gomez assessed Campbell as "doing very well from our point of view." (R. 416).

Dr. Schultz's records included his notes from two follow-up examinations of Campbell. On November 7, 2012, Dr. Schultz noted that "[s]ince [Campbell's] last visit, he has been doing fairly well. … He … recently followed up with his neurologist. Everything seems to be stable." (R. 422). On March 6, 2013, Dr.

16

Schultz again noted that Campbell "has been doing well" and that Campbell "denies any new complaints today." (R. 417). As before, he continued to note that Campbell appeared normal and alert, that his stroke syndrome was being followed by Dr. Gomez, that he had no neurological symptoms, and that his neurological system was grossly intact. (R. 419-20, 424-25).

The records from Grayson & Associates covered five mental health evaluations of Campbell from June 2012 through February 2013. The records reflected that Campbell's memory and concentration were impaired and that he reported feeling depressed. (R. 486-91). He was prescribed Zoloft. (*Id.*)

On April 18, 2013, a vocational consultant at University Disability Consortium performed an occupational analysis of Campbell's position as an inside salesman at J&B. (R. 452-53). The consultant determined that Campbell's position would relate to the DOT title of telephone solicitor and that the physical demand characteristics for a telephone solicitor generally fell within the sedentary exertion level. (R. 453).

Campbell's file was referred to Dr. James Bress, a physician consultant at University Disability Consortium, for an external medical assessment. On April 22, 2013, Dr. Bress issued a report concluding that Campbell could perform full-time light work with frequent sitting, standing, and walking and maximum lifting

of 25 pounds.  (R. 440-45).   His subsequent review of the additional medical

records from Drs. Schultz and Gomez did not change his assessment.  (R. 408-09).

On May 18, 2013, Knopf provided United of Omaha with a copy of a

favorable decision from the Social Security Administration ("SSA") on Campbell's

parallel claim for Social Security disability benefits.  (R. 390-401).  The

administrative law judge ("ALJ") who issued the decision found that Campbell had

"severe" impairments of status post bilateral cerebral infractions; diabetic

neuropathy; cognitive disorder; and depressive disorder.  (R. 398).  He determined

that Campbell had the residual functional capacity to perform sedentary work, but

was unable to perform any of his past relevant work.  (R. 399-400).  The ALJ

concluded that Campbell had been disabled since November 17, 2011, the date he

suffered his stroke at work.  (R. 401).

United of Omaha provided a copy of the SSA decision to Dr. Bress.  The

decision did not change Dr. Bress's prior opinion that Campbell was capable of

performing full-time light work.  (R. 386-87).

By letter dated June 17, 2013, signed by Burns-Bierwith, United of Omaha

upheld its denials of Campbell's claims for STD and LTD benefits.  (R. 376-82).

United of Omaha concluded that "the medical documentation currently in [the] file

does not support restrictions and limitations due to any functional, psychiatric, or

cognitive impairment that would prevent Mr. Campbell from performing the

18

material duties of his regular job and/or regular occupation." (R. 380). United of Omaha acknowledged that Campbell was determined to be disabled by the SSA, but noted that "our decisions are based on the provisions of the policies issued to [Campbell's] employer, the documentation provided to us for support of the disability (i.e., medical records, claim forms, etc.) and the regulations as set forth by the state and ERISA." (R. 380-81). United of Omaha informed Campbell that he had exhausted all of his administrative rights to appeal and advised him of his ERISA rights. (R. 381).

After his appeals were denied, Campbell retained his current counsel, who submitted another "formal notice of appeal." (R. 365-66). United of Omaha advised Campbell's counsel that it was unable to consider his appeal request because Campbell had exhausted his appeal rights under the policies. (R. 362). Campbell then filed the pending ERISA action.

## II.  ERISA REVIEW STANDARDS

Where, as here, an employee welfare benefit plan is governed by ERISA, a beneficiary is authorized to bring suit to recover benefits or enforce rights under the terms of the plan. 29 U.S.C. § 1132(a)(1)(B).[5] "ERISA itself provides no standard for courts reviewing the benefits decisions of plan administrators or

---

[5] 29 U.S.C. § 1132(a)(1)(B) provides that a civil action may be brought "by a participant or beneficiary … to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."

fiduciaries." *Blankenship v. Metropolitan Life Ins. Co.*, 644 F.3d 1350, 1354 (11th Cir. 2011) (citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 108-09 (1989)).  However, based on the Supreme Court's guidance in *Firestone* and *Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105 (2008), the Eleventh Circuit has established a multi-step framework to guide courts in reviewing an ERISA plan administrator's benefits decisions. *See Williams v. BellSouth Telecomms., Inc.*, 373 F.3d 1132, 1137-38 (11th Cir. 2004), *overruled on other grounds by Doyle v. Liberty Life Assurance Co. of Boston*, 542 F.3d 1352 (11th Cir. 2008).  For a court reviewing a plan administrator's benefits decision, the present framework goes this way:

> (1) Apply the *de novo* standard to determine whether the claim administrator's benefits-denial decision is "wrong" (*i.e.*, the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision.
>
> (2) If the administrator's decision in fact is "*de novo* wrong," then determine whether he was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision.
>
> (3) If the administrator's decision is "*de novo* wrong" and he was vested with discretion in reviewing claims, then determine whether "reasonable" grounds supported it (hence, review his decision under the more deferential arbitrary and capricious standard[6]).

---

[6] In ERISA cases, the phrases "arbitrary and capricious" and "abuse of discretion" are used interchangeably.  *Blankenship*, 644 F.3d at 1355 n.5 (citing *Jett v. Blue Cross & Blue Shield of Ala., Inc.*, 890 F.2d 1137, 1139 (11th Cir. 1989)).

(4) If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest.

(5) If there is no conflict, then end the inquiry and affirm the decision.

(6) If there is a conflict, the conflict should merely be a factor for the court to take into account when determining whether an administrator's decision was arbitrary and capricious.

*Blankenship*, 644 F.3d at 1355 (footnote added) (citing *Capone v. Aetna Life Ins. Co.*, 592 F.3d 1189, 1195 (11th Cir. 2010)).  Review of the plan administrator's decision to deny or terminate benefits is limited to consideration of the material available to the administrator at the time it made its decision.  *Blankenship*, 644 F.3d at 1354 (citing *Jett*, 890 F.2d at1140).

## III.  DISCUSSION

The parties have filed cross-motions for summary judgment on Campbell's remaining claim under 29 U.S.C. § 1132(a)(1)(B) for the recovery of STD and LTD benefits.  (Docs. 20 & 23).   As the issues and arguments pertinent to both motions for summary judgment are essentially the same, the court will address both motions together.

## A.    The Plan

As an initial matter, the court agrees with the Defendants that the Plan is entitled to judgment in its favor and is due to be dismissed from this action. Campbell has offered no basis for holding the Plan liable for the STD and LTD

benefits he claims are due to him.  Indeed, it is undisputed that the Plan was not its own "plan administrator," that the Plan did not make any claims determinations, and that the Plan was not responsible for paying benefits under either the STD policy or the LTD policy.  *See Hamilton v. Allen-Bradley Co.*, 244 F.3d 819, 824 (11th Cir. 2001) (noting that 29 U.S.C. § 1132(a)(1)(B) "confers a right to sue the plan administrator for benefits" and that the key factor in determining whether a party is a plan administrator is the exercise of "decisional control over the claim process").  Campbell has offered no evidence that the Plan had any decisional control over—or even any involvement in—the claim process.  Accordingly, the Plan is entitled to summary judgment in its favor.

**B.**     *De Novo* **or Arbitrary and Capricious Review?**

The parties disagree sharply over the standard of review to be applied by the court.  Campbell argues that his § 1332(a)(1)(B) claim should be decided under a *de novo* standard of review and that the court should not apply an arbitrary and capricious standard at any stage of its review.  Campbell contends that *de novo* review applies because "United [of Omaha] was the one granted discretionary authority [to make benefits determinations] under the policy but [Mutual of Omaha] was the one who made the decision" to deny his claims for benefits.  (Doc. 26 at 21).  In support of his assertion that Mutual of Omaha made the decision to deny him benefits, Campbell cites United of Omaha's statement in its responses to

his first requests for admission that "Mutual of Omaha … employs the person(s) who made the decision to deny benefits to [Campbell]."  (Doc. 24-3 at 7). Campbell construes this statement as an admission by United of Omaha that it was Mutual of Omaha that denied his claims.[7]  Because Mutual of Omaha was not granted the discretion to make benefits determinations under the Plan, Campbell argues that *de novo* review applies.

United of Omaha counters that the Mutual of Omaha employees who made the claims determinations were acting on United of Omaha's behalf.  United of Omaha asserts that "[Campbell's] argument ignores the practical reality that United of Omaha, like every other company, can only act through its employees or *agents*. … In this case, those agents acting on United of Omaha's behalf are employees of Mutual of Omaha.  Their status does not alter the unequivocal reality that, while employed by Mutual of Omaha, in connection with this claim, they were acting on behalf of United of Omaha."  (Doc. 28 at 5).  United of Omaha argues that because the Plan grants it discretionary authority to make benefits determinations, and because it exercised that authority through its agents, the arbitrary and capricious standard of review applies.  The court agrees.

---

[7] United of Omaha's response to Campbell's motion for summary judgment includes the following statement: "[Campbell] argues that the *de novo* standard of review applies because United of Omaha did not make the claim determination in this case."  (Doc. 28 at 4).  In his reply brief, Campbell cites this statement as another admission by United of Omaha that it did not make the decision to deny him benefits.  (Doc. 33 at 7).  The court disagrees.  Read in context, it is clear that United of Omaha was merely summarizing Campbell's argument and was not admitting that it did not make the  benefits decision.

As United of Omaha points out, all of the letters to Campbell and his counsel communicating the status and resolution of his benefits claims were from United of Omaha and written on United of Omaha letterhead with a United of Omaha address.[8] (*See, e.g.,* R. 128-31, 269, 362, 376-82, 454-55, 493-96, 501-02, 505-06, 518-23, 674).  In addition, the letters denying Campbell's claims for STD benefits and LTD benefits directed Campbell to send any appeals to United of Omaha, and the letter denying his appeals stated that "United of Omaha … will conduct no further review of the claims" and that "United of Omaha … has conducted a full and fair review of your appeal[s]."  (R. 130, 381, 522).  In short, the letters consistently and unambiguously reflect that it was United of Omaha that reviewed and decided Campbell's claims, notwithstanding that it utilized Mutual of Omaha employees to make those determinations.   It being undisputed that United of Omaha had discretionary authority to make benefits decisions under the Plan, the arbitrary and capricious standard of review applies to its decisions here.

In support of his contention that the *de novo* standard of review applies, Campbell relies primarily on *Anderson v. Unum Life Ins. Co. of America*, 414 F. Supp. 2d 1079 (M.D. Ala. 2006).  The facts of *Anderson*, however, are readily distinguishable from the facts of this case.  In *Anderson*, Unum Life Insurance Company of America ("Unum America") was granted discretionary authority to

---

[8] The letters also included a Mutual of Omaha logo.

make benefits determinations under a long-term disability policy, but it assigned

those duties to its parent corporation, UnumProvident Corp., in a General Services

Agreement.  The General Services Agreement expressly provided that

UnumProvident "is engaged in an independent business and will perform its

obligations under this Agreement as an independent contractor and not as the

employee, partner or agent" of Unum America.  *Id.* at 1087 (internal quotations

omitted).  In addition, the employees who made the decision to deny the plaintiff's

benefits claim and to reject her appeal of that decision identified themselves as

UnumProvident employees in all of their correspondence with the plaintiff; all of

their letters to the plaintiff were preprinted with UnumProvident's name and

address; and the letter denying her claim directed her to mail her appeal request to

UnumProvident.  *Id.* at 1098.  Finding that "UnumProvident is the entity which

made the benefits-denial decision" and that "UnumProvident does not share the

same discretionary authority as Unum [America] to determine eligibility for

benefits under [the] policies," the court concluded that the decision to deny the

plaintiff's claim for benefits was subject to *de novo* review.  *Id.* at 1100.

Here, in contrast, there is no evidence that United of Omaha assigned or

delegated its benefits-determination duties to Mutual of Omaha, nor is there any

evidence that the Mutual of Omaha employees who were involved in the review of

Campbell's claims were acting as independent contractors rather than as agents of

United of Omaha.   Moreover, as noted, the letters to Campbell and his counsel were written on United of Omaha letterhead and Campbell was directed to mail his appeals to United of Omaha.  Unlike in *Anderson*, the evidence here establishes that United of Omaha, the entity with the discretionary authority to make benefits determinations under the Plan, was in fact the entity that made the decisions to deny Campbell's claims for benefits.

Another case involving Unum America and UnumProvident, *Zurndorfer v. Unum Life Ins. Co. of America*, 543 F. Supp. 2d 242, 257 (S.D.N.Y. 2008), addressed the very issue presented here: "whether a corporation named as a fiduciary in a disability plan governed by ERISA may discharge its duties through the actions of authorized agents who are employed by or otherwise affiliated with the fiduciary's parent corporation."  In *Zurndorfer*, Unum America was given the discretionary authority to make benefits determinations under a long-term disability plan, but the parties disputed whether Unum America or UnumProvident had made the decision to terminate the plaintiff's disability benefits.  The evidence suggested, in part, that one of the employees involved in the decision-making process (Nicholas) was a UnumProvident employee, that two other employees involved in the process (Flaherty and Leddy) sometimes worked on UnumProvident's behalf, and that the plaintiff had been directed to send his

26

appeals to UnumProvident.  *Id.* at 256.  Nonetheless, the court determined that it was Unum America that made the decision to terminate the plaintiff's benefits:

> As a corporation, Unum America can only act through its agents, and there is no indication that Nicholas, Leddy and Flaherty were not acting as Unum America's agents when they made decisions related to plaintiff's claims.  *See Braswell v. United States,* 487 U.S. 99, 110, 108 S. Ct. 2284, 101 L. Ed. 2d 98 (1988) ("Artificial entities such as corporations may act only through their agents ....")  The Court is unaware of any authority which requires a corporation acting as an ERISA fiduciary to limit its choice of agents to carry out its obligations absent a controlling contractual obligation.  … Here, the parties contracted for Unum America to make the benefit determinations, and it is beyond dispute that authorized agents of Unum America, whatever their other roles within [the] UnumProvident structure [,] acted as claims administrators. … Moreover, there is no competent evidence before the Court to suggest that the contractual provision granting Unum America discretionary authority precluded Unum America from acting through agents that were employed by its parent.

 *Id.* at 257.  The court then applied the arbitrary and capricious standard in its review of the decision to terminate the plaintiff's benefits.  *See also MacDonald v. Anthem Life Ins. Co.*, 2014 WL 4809534, **13-14 (M.D. Fla. Sept. 26, 2014) (finding that the decision to terminate the plaintiff's disability benefits was made by an authorized agent of the entity with the discretionary authority to make such decisions, notwithstanding that the agent who made the decision was employed by the entity's parent company).

    Here, similarly, there is no indication that the employees who made the decisions to deny Campbell's benefits claims were not acting as United of

Omaha's authorized agents when they did so.  Indeed, the United of Omaha letters

to Campbell and his counsel were all signed by the Mutual of Omaha employees

who made the benefits decisions, which is evidence of their authority to act on

behalf of United of Omaha.[9]  Likewise, there is no evidence to suggest that the

policy provisions granting United of Omaha the discretionary authority to make

benefits determinations precluded United of Omaha from acting through agents

who were employed by its parent.  Therefore, the arbitrary and capricious standard

of review applies.

Before moving on, the court needs to address one remaining issue.  In

United of Omaha's brief in response to Campbell's motion for summary judgment,

United of Omaha asserted that "Mutual of Omaha employees act on behalf of

United of Omaha to review and investigate claims and make claims determinations

on behalf of United of Omaha pursuant to an Administrative Services Agreement."

(Doc. 28 at 4-5).  Because United of Omaha did not produce a copy of the

Administrative Services Agreement during discovery and it was not part of the

record before the court, the court ordered United of Omaha to produce a copy of

the agreement (which it did) and afforded the parties the opportunity to address the

---

[9] The court also observes that Campbell submitted a copy of United of Omaha's answers to his interrogatories (doc. 24-5) in support of his motion for summary judgment.  Although unsigned, the answers are set up for verification by Bobbi Burns-Bierwith, who is identified as United of Omaha's "Appeals Specialist" and who is "authorized by Defendant United of Omaha Life Insurance Company to answer the Interrogatories set forth herein …."  (Doc. 24-5 at 23).  The court does not know whether Burns-Bierwith ever signed the answers, but it appears that she had the authority to do so notwithstanding that she was an employee of Mutual of Omaha.

agreement's impact, if any, on the motions for summary judgment.  (Docs. 40 & 43).  Campbell objected strenuously to the production of the Administrative Services Agreement at this late stage of the proceedings, arguing that the Defendants denied the existence of the agreement in their discovery responses and "hid" the agreement in violation of the Rules of Civil Procedure and the court's scheduling orders.  (Doc. 42 at 5-6).  The Defendants disputed that they ever denied the existence of the Administrative Services Agreement or hid it from Campbell.  (Doc. 46 at 2).  They asserted that the agreement is not part of the ERISA administrative record and not a plan document, and that they "do not intend for the Court to rely on or even consider the Agreement to make its decision." (Doc. 46 at 4).

In light of Campbell's objection to the production of the Administrative Services Agreement and the Defendants' position that they do not intend for the court to consider the agreement in reaching its decision here, the court has not considered the agreement in ruling on the pending motions for summary judgment. The court does, however, offer two observations regarding the agreement and its production.  First, the court disagrees with Campbell that the Defendants denied the existence of the Administrative Services Agreement and hid it from him during discovery.  To the contrary, in United of Omaha's answers to Campbell's interrogatories, United of Omaha stated that "there is an administrative/sharing

agreement regarding Mutual of Omaha employees …." (Doc. 24-5 at 13).  While it is true that United of Omaha did not produce a copy of the agreement during discovery—United of Omaha objected to Campbell's request for "any service agreements whereby United of Omaha agrees or has agreed to provide services relative to the Plaintiff's policies" (doc. 24-4 at 20)—Campbell never moved to compel production of the agreement despite having been informed of its existence. Second, even if the court were to consider the Administrative Services Agreement, it would not change the court's decision on the motions for summary judgment.

## C.    The Defendants' Motion to Exclude

Before addressing the cross-motions for summary judgment, the court will first address the Defendants' motion to exclude certain of Campbell's exhibits and portions of his response brief.  (Doc. 32).  Specifically, the Defendants have moved to exclude Exhibits 1, 2, and 3 (docs. 29-1, 29-2, & 29-3) to Campbell's response to their motion for summary judgment, and to exclude pages 10 through 12 of that response. (Doc. 29).

Exhibit 1 is a copy of Campbell's discharge summary from UAB Hospital on April 18, 2014, following his admission to the hospital on April 16, 2014. Exhibit 2 is a copy of a UAB hospital record dated April 16, 2014, summarizing the results from a CT scan and MRI of Campbell's head.  Both of these exhibits are due to be excluded.  As previously noted, review of a plan administrator's decision

to deny or terminate benefits is limited to consideration of the evidence available to the administrator at the time it made its decision.  *See Blankenship*, 644 F.3d at 1354.  Neither of these exhibits was available at the time United of Omaha made its benefits-denial decisions and they are not part of the ERISA administrative record.  The Defendants' motion to exclude Exhibits 1 and 2 is due to be granted.

Exhibit 3 is a copy of a slip opinion from the United States District Court for the Eastern District of Michigan that discusses, in part, the credibility and reliability of Dr. Bress, United of Omaha's outside physician consultant here. *Warren v. Hartford Life & Accident Ins. Co.*, Case No. 2:06-cv-1949 (E.D. Mich. 2007).  The Defendants have moved to exclude the *Warren* opinion and pages 10 through 12 of Campbell's response, where Campbell cites *Warren* and various other judicial opinions addressing Dr. Bress's credibility and reliability.  This aspect of the Defendants' motion to exclude is due to be denied.  The court has not relied on any of the factual findings in *Warren* in reaching its decisions here, nor has it taken judicial notice of any such factual findings, admitted them as evidence, or given them any weight.  Likewise, the court has not considered the argument at pages 10 through 12 of Campbell's response as evidence.  It is argument, and has been treated as such.

## D.    Review of United of Omaha's Claims Decisions

Having determined that the arbitrary and capricious standard of review

applies to United of Omaha's benefits-denial decisions, the court will assume, for purposes of its analysis, that the decisions were *de novo* wrong and proceed directly to an arbitrary and capricious analysis. *See Howard v. Hartford Life & Accident Ins. Co.*, 929 F. Supp. 2d 1264, 1287 n.19 (M.D. Fla. 2013) ("the Court will bypass the *de novo* right or wrong determination, and proceed directly to an arbitrary and capricious analysis"). "Under the arbitrary and capricious standard of review, the court seeks 'to determine whether there was a reasonable basis for the [administrator's] decision, based upon the facts as known to the administrator at the time the decision was made.' " *Hunt v. Hawthorne Associates, Inc.*, 119 F.3d 888, 912 (11th Cir. 1997) (quoting *Jett v. Blue Cross and Blue Shield of Ala., Inc.*, 890 F.2d 1137, 1139 (11th Cir. 1989)). As long as a reasonable basis appears for the administrator's decision, "it must be upheld as not being arbitrary and capricious, even if there is evidence that would support a contrary decision." *Jett*, 890 F. 2d at 1140; *Hilyer v. Hartford Life & Accident Ins. Co.*, 2011 WL 925027, *18 (N.D. Ala. 2011) (quoting *Jett*).

Here, Campbell asserts that United of Omaha's benefits-denial decisions were arbitrary and capricious.[10]  He argues that (1) he is entitled to continued

---

[10] In his summary judgment briefs, Campbell directs his arguments to Mutual of Omaha (which he refers to as "MOO") rather than United of Omaha, in keeping with his contention that it was Mutual of Omaha that denied his benefits claims. (*See, e.g.,* Doc. 26 at 26 (referring to "MOO's arbitrary and capricious termination" of his benefits)).  Because the court has rejected his contention and has determined that United of Omaha made the claims decisions, the court will treat his arguments as if they were directed to United of Omaha.

benefits because there is no evidence of a significant improvement in his condition since United of Omaha first approved the payment of STD benefits; (2) United of Omaha operated under a conflict of interest that improperly influenced its benefits decisions; (3) United of Omaha disregarded the favorable SSA decision finding him disabled; and (4) United of Omaha failed to give meaningful consideration to the evidence, which establishes that he is disabled as a matter of law.  United of Omaha disputes all of Campbell's arguments and asserts that its benefits-denial decisions were reasonable and not arbitrary and capricious.

### 1.    Initial payment of STD benefits

Campbell argues that United of Omaha acted unreasonably when it initially approved the payment of STD benefits but then refused to pay any further benefits despite no significant improvement in his condition.  (Doc. 26 at 24-26).  United of Omaha responds that, instead of waiting until it had completed its review of Campbell's STD claim, it went ahead and approved the payment of STD benefits through January 23, 2012, while it conducted its claim review.  United of Omaha argues that it should not be "punished" for accommodating Campbell while it reviewed his claim.  United of Omaha also argues that the burden remains with Campbell to prove he is entitled to benefits, regardless of whether his claim was initially approved.  (Doc. 28 at 17-19).

The court agrees with United of Omaha.  The evidence reflects that United

of Omaha acknowledged receipt of Campbell's application for STD benefits on January 24, 2012. (R. 275). The very next day United of Omaha approved the payment of STD benefits through January 23, 2012, while noting that "[i]n order to properly review your claim to determine if additional benefits can be allowed, we are requesting additional information from your physician." (R. 269). It does not appear that United of Omaha had made a substantive determination of disability at that time, but simply agreed to pay Campbell for a limited period of time while it conducted its formal review of his claim. In other words, United of Omaha had not made any sort of binding determination that Campbell was, in fact, disabled.

Moreover, the burden to show continued entitlement to benefits remains with Campbell even though he initially received a period of STD benefits through January 23, 2012. *See Cosgrove v. Raytheon Co. Long Term Disability Plan*, 277 F. App'x 879, 880 (11th Cir. 2008) ("the burden of persuasion remains with [the claimant] even though she received a period of short term disability benefits and a period of long term benefits under the Plan"); *Howard*, 929 F. Supp. 2d at 1287 ("[I]n instances where LTD benefits are once approved, and subsequently terminated, a claimant retains the burden of proving continued disability after benefits are discontinued and the administrator need not show a change in the claimant's condition."); *c.f. Stiltz v. Metro. Life Ins. Co.*, 244 F. App'x 260, 265 (11th Cir. 2007) (determining that the payment of disability benefits is not a

34

relevant consideration in reviewing the denial of ERISA benefits).  The fact that United of Omaha approved an initial period of STD benefits did not preclude it from later determining that Campbell was not entitled to any further benefits.  *See Ruple v. Hartford Life & Accident Ins. Co.*, 340 F. App'x 604, 614 (11th Cir. 2009) ("Nothing in the policy stated or implied that once long-term benefits were granted, the claimant would forever be entitled to them.").  Campbell still must show his continued entitlement to benefits beyond January 23, 2012.

### 2.     Conflict of Interest

Campbell next argues that United of Omaha, which is responsible for both determining eligibility under the Plan and paying awarded benefits out of its own funds, allowed this "conflict of interest" to affect its administration of his benefits claims.  (Doc. 26 at 27-28).  United of Omaha concedes that it operates under a structural conflict of interest, but argues that Campbell has offered no evidence as to how the conflict allegedly impacted its decisions.  (Doc. 28 at 10).  Again, the court agrees with United of Omaha.

Under the *Blankenship* framework, a conflict of interest is merely a factor to be taken into account in determining whether an administrator's decision was arbitrary and capricious.  *Blankenship*, 644 F.3d at 1355.  Where a conflict exists, " 'the burden remains on the plaintiff to show the decision was arbitrary; it is not the defendant's burden to prove its decision was not tainted by self-interest.' "  *Id.*

(quoting *Doyle*, 542 F.3d at 1360)).  Here, Campbell has utterly failed to show how United of Omaha's conflict of interest rendered its claims decisions arbitrary and capricious.  Indeed, Campbell admits in his summary judgment brief that "the extent to which [United of Omaha] permitted that conflict to influence the employees who handled Campbell's claim[s] is somewhat unknown ...."[11]  (Doc. 26 at 28).  Furthermore, the letters from Julie Shahan, Teresa Strong-Hilger, and Bobbi Burns-Bierwith conveying United of Omaha's benefit determinations all contained the following statements:

> I have not had contact with company actuaries or financial personnel and have no information with regard to the effect of this claim handling on company financial results.  You should also know that I did not receive, nor was I eligible to receive, any financial or other incentive or penalty based on the denial or approval of your claim.[12]

(R. 130, 523, 381).  Campbell has offered no evidence, or even any argument, that contradicts these representations.  In sum, Campbell has not shown that United of Omaha's structural conflict of interest had any improper influence on its benefit determinations, much less that it rendered those determinations arbitrary and capricious.

---

[11] Campbell complains that United of Omaha refused to respond to his discovery requests on the conflict-of-interest issue.  (Doc. 26 at 28).  To the extent United of Omaha objected to Campbell's discovery requests seeking such information, Campbell never filed a motion to compel United of Omaha to provide the information.  Having failed to do so (for whatever reason), Campbell cannot now complain that the information was not provided.

[12] The letter from Burns-Bierwith, which communicated United of Omaha's denial of Campbell's appeals, referred to "the claims" rather than "your claim."

### 3.     The SSA decision

Campbell also argues that United of Omaha "was not and is not free to disregard the SSA decision" finding him disabled and that it was "both arbitrary and capricious" for United of Omaha to do so.  (Doc. 26 at 31).  United of Omaha retorts that Campbell's argument ignores the evidence and that SSA decisions are not dispositive in ERISA cases.  (Doc. 28 at 16-17).  United of Omaha is right on both fronts.

Campbell's contention that United of Omaha ignored the SSA decision is simply not accurate.  The administrative record reflects that after Campbell provided United of Omaha with a copy of the decision, it forwarded the decision to its outside medical consultant, Dr. Bress.  Dr. Bress reviewed the SSA decision and determined that it did not change his prior opinion that Campbell was capable of full-time light work.  (R. 386-87).  In its subsequent letter denying Campbell's appeals, United of Omaha specifically addressed the SSA decision and Dr. Bress's assessment that the decision did not change his opinion.  (R. 379-81).  United of Omaha did not ignore the SSA decision.

In addition, the SSA decision is not, in any event, dispositive in this ERISA case.  *See Ray v. Sun Life & Health Ins. Co.*, 443 F. App'x 529, 533 (11th Cir. 2011) ("[W]hile approval of social security benefits may be considered, it is not conclusive on whether a claimant is also disabled under the terms of an ERISA

37

plan."); *Paramore v. Delta Air Lines, Inc.*, 129 F.3d 1446, 1452 n.5 (11th Cir. 1997) ("Although a court may consider [a Social Security Administration determination of disability] in reviewing a plan administrator's decision regarding eligibility for benefits under an ERISA-governed plan … an award of benefits by the Social Security Administration is not dispositive of the issue before us … ."). It is a factor that may be considered, but it is not dispositive.

### 4.    The medical evidence

The ultimate issue for resolution is whether United of Omaha's benefits-denial decisions were reasonable in light of the facts known by United of Omaha at the time it made its decisions.  Campbell argues that "the strength of the evidence supporting [his] disability" demonstrates that the decisions were arbitrary and capricious.  (Doc. 26 at 26).  He asserts that "his attending neurologist, testing neuropsychologist, treating psychiatrists, [and the] SSA appointed psychologists" are all in agreement that he is disabled, and that the only disagreement comes from United of Omaha and its "paid expert who never saw Campbell and who isn't even a qualified neurologist."  (Doc. 26 at 24).  Not surprisingly, United of Omaha takes the opposite view.  United of Omaha argues that "the records from [Campbell's] own physicians and external medical reviews support [its] decision."  (Doc. 22 at 18).  United of Omaha asserts that "[o]nly Dr. Boll supports [Campbell's] claim, and Dr. Boll's opinions are outweighed by those of Drs. Schultz and Gomez, who

regularly treated" Campbell.  (Doc. 22 at 22).   United of Omaha further asserts that its "external medical reviews agreed with Drs. Schultz and Gomez."  (*Id.*) United of Omaha insists that it "reasonably determined" that Campbell was no longer eligible for disability benefits based on the "substantial evidence" before it. (*Id.*)

### a.  The denial of further STD benefits

As previously noted, United of Omaha approved the payment of STD benefits to Campbell through January 23, 2012, but denied the payment of STD benefits (and LTD benefits) beyond that date.  After carefully reviewing the ERISA administrative record, the court finds that United of Omaha's decision to deny STD benefits to Campbell beyond January 23, 2012, was not reasonable.  It is undisputed that Campbell became eligible for STD benefits on January 1, 2012, when his 44-day elimination period ended.  Under the STD policy, STD benefits were payable for a maximum of seven weeks or until benefits became payable under the LTD policy, which has a 90-day elimination period.  Therefore, had STD benefits been approved beyond January 23, 2012, they would have been payable until on or about February 16, 2012, when benefits would have become payable under the LTD policy (90 days from November 18, 2011).  In other words, STD benefits would have been payable for just over three more weeks.

The evidence reflects that Campbell's primary treating physician, Dr.

Schultz, completed a Family and Medical Leave Act certification form for

Campbell on January 17, 2012.  He confirmed that Campbell was unable to

perform "all … job functions listed," which included answering and initiating sales

calls and heading J&B's telemarketing program.  (R. 299-300).   Dr. Schultz also

completed an Attending Physician's Statement in support of Campbell's STD

application on January 20, 2012.  Dr. Schultz opined that Campbell had been

continuously disabled since suffering his stroke on November 17, 2011, and that he

should be able to return to work in three to six months.  (R. 284).  With respect to

Campbell's mental limitations and abilities, Dr. Schultz noted that Campbell's

capabilities were either "fair" or "guarded" and assessed his overall prognosis as

"guarded."  (R. 284).

Campbell's treating neurologist, Dr. Gomez, examined Campbell on March

12, 2012, and noted that Campbell's memory was decreased and that he was "very

likely [o]n the verge of developing some form of vascular dementia" as a

consequence of his "multiple cerebral infarctions."  (R. 139).  Dr. Gomez

expressed the opinion that Campbell was disabled—he commented that

Campbell's disability "appears quite evident"—but felt that additional evidence

was warranted and referred Campbell for neuropsychological testing.  (R. 138-39).

Dr. Boll, a neuropsychologist, examined Campbell on March 28, 2012, and

determined that Campbell had "sufficient neurocognitive difficulties to make it

40

unlikely that he [would] be able to return to work in his former position." (R. 101). On April 4, 2012, Campbell reviewed his test results with Dr. Gomez, who commented that "[t]he neuropsychological testing shows factual evidence that [Campbell] has deficits of a neurologic nature [that] will likely prevent him from going back to work," which was "exactly" as Dr. Gomez had suspected. (R. 650).

Dr. Schultz conducted a physical examination of Campbell on May 10, 2012, and noted that Campbell "continues to have problems with memory, as well as some numbness in his left and right arm that has been attributed to his recent stroke." (R. 543). Four days later, Dr. Schultz completed a Physician's Statement in support of Campbell's application for LTD benefits. (R. 72-73). Dr. Schultz reported a diagnosis of "stroke syndrome" with symptoms of "memory impairment and paresthesia." (R. 72). He indicated that Campbell's prognosis for recovery was "unknown" at that time and that he did not expect fundamental changes in Campbell's condition for a year or more. (R. 73).

In July 2012, Campbell was examined by a consultative psychologist in connection with his application for SSA benefits. The psychologist determined that Campbell had a cognitive disorder and a depressive disorder. (R. 398).

Despite all this evidence, United of Omaha denied STD benefits to Campbell beyond January 23, 2012, and denied his appeal of that decision. United of Omaha defends the reasonableness of its decision by arguing that only Dr.

Boll's opinion supports Campbell's disability claim.  That is simply not true.
United of Omaha ignores that Dr. Gomez, who referred Campbell to Dr. Boll for
neurological testing, found that the results of Dr. Boll's testing showed "factual
evidence" of neurologic deficits that would likely prevent Campbell from returning
to work.  In other words, Dr. Gomez embraced Dr. Boll's findings and opinions.
In addition, as late as May 2012 Dr. Schultz reported that Campbell was suffering
from stroke syndrome with symptoms of memory impairment, and the consultative
psychological examination of Campbell in July 2012 determined that he has a
cognitive impairment.

    United of Omaha also points to the medical review performed by its external
physician consultant, Dr. Bress, who concluded that Campbell could perform full-
time light work as of January 23, 2012.[13]  (R. 387, 409, 445).  Dr. Bress discredited
Dr. Boll's findings, proclaiming that Dr. Boll's findings were in "stark contrast to
multiple notes by Dr. Schultz who noted no cognitive deficits and 'no neurological
symptoms.' "  (R. 445).  This statement by Dr. Bress is misleading.  While it is true
that Dr. Schultz noted that Campbell had no neurological symptoms at each visit,
he never noted that Campbell had "no cognitive deficits."  Rather, his notes simply
do not mention any cognitive deficits.  Dr. Schultz did note that Campbell
appeared normal and alert at each of his visits, but there is no evidence that Dr.

---

[13] The nurses who examined Campbell's medical records also determined that he could perform
the essential duties of his job as of January 23, 2012.

Schultz ever performed any neuropsychological or other cognitive testing on Campbell. There certainly is no evidence of any testing by Dr. Schultz that contradicted Dr. Boll's finding that Campbell suffered from neurocognitive deficits sufficient to prevent him from going back to work. The fact that Dr. Schultz did not note any cognitive deficits is not a reasonable ground to reject Dr. Boll's neuropsychological testing results in the absence of any evidence that Dr. Schultz ever tested Campbell for cognitive deficits and found none, especially when Dr. Schultz indicated on his Attending Physician's Statement that Campbell was disabled and suffered from a number of mental limitations.

Moreover, to the extent that Dr. Schultz's notes do not reflect that Campbell ever complained of any neurological issues or cognitive problems, it is apparent that Campbell was looking to Dr. Gomez, his neurologist, as his primary treating source for those issues. Indeed, Dr. Schultz's notes consistently and repeatedly reflect that Campbell's stroke syndrome was being followed by Dr. Gomez (*see* R. 191, 195, 199, 550), and in his Physician's Statement in support of Campbell's LTD application Dr. Schultz deferred to Dr. Gomez as to when Campbell might be expected to return to his prior level of functioning. (R. 73). Again, it was Dr. Gomez's opinion on March 12, 2012, that Campbell was disabled and likely on the verge of developing some form of vascular dementia, an opinion that Dr. Boll's neuropsychological examination of Campbell confirmed to Dr. Gomez's

satisfaction.

United of Omaha also defends its decision to deny additional STD benefits to Campbell by noting that the imaging reports of Campbell's head and neck were mostly normal and that Dr. Adler, who examined Campbell on January 11, 2012, referred to Campbell's condition as a "TIA, for which lasting deficits would not be expected." (Doc. 22 at 19). This evidence, however, says nothing about whether Campbell was experiencing any deficits at that time, regardless of whether they were caused by a cerebral vascular event or a TIA. In this regard, the court notes that Dr. Adler was asked to evaluate "a possible thrombophilic disorder causing [Campbell's] TIAs and strokes," not to evaluate the effects of his TIAs and strokes. (R. 233). The court also notes that Dr. Adler did not refer to a singular TIA, but rather to a "[h]istory of recurrent strokes/TIAs." (R. 234).

In sum, the court is satisfied that Campbell has met his burden of establishing that he was entitled to continued STD benefits through February 16, 2012, and that United of Omaha did not have reasonable grounds for denying such benefits. The arbitrary and capricious nature of United of Omaha's decision is highlighted by the fact that when United of Omaha denied continued STD benefits to Campbell on March 26, 2012, it expressly cited the need for neuropsychological testing results. When Campbell then provided his neuropsychological testing results, and they supported his STD claim, United of Omaha rejected the results

primarily because Campbell's internist had noted no cognitive deficits or neurological symptoms in his treatment notes, an arbitrary basis for rejecting the neuropsychological testing results given that (1) Campbell's internist had expressed the opinion in his Attending Physician's Statement that Campbell was disabled, and (2) Campbell's stroke syndrome was being monitored by his neurologist, not by his internist, and the neurologist reviewed and embraced the neuropsychological testing results.

Accordingly, the court concludes that Campbell's motion for summary judgment on his claim for reinstatement of STD benefits is due to be granted and that the Defendants' cross-motion for summary judgment on that same claim is due to be denied.

### b.      The denial of LTD benefits

United of Omaha's denial of Campbell's claim for LTD benefits is a different story.  As United of Omaha observes in its brief in support of it motion for summary judgment, Campbell's "more recent medical records reveal that he consistently reported to his doctors that he was doing well and improved."  (Doc. 22 at 18).  On October 4, 2012, Dr. Gomez noted that "[s]ince the last time he was seen, approximately 6 months ago, [Campbell] has been doing better than before. [He] is going to a psychiatrist and being treated."  (R. 415).  His overall impression was that Campbell was "doing very well from our point of view."  (R. 415-16).  On

November 7, 2012, Dr. Schultz commented that Campbell had been "doing well" and that "[e]verything seems to be stable." (R. 422). And on March 13, 2012, Dr. Schultz again noted that Campbell had been "doing well" and that Campbell denied any new complaints. (R. 417).

The court acknowledges that the SSA determined on April 23, 2013, that Campbell had been disabled since he suffered his stroke at work on November 17, 2011. (R. 390-401). As Dr. Bress noted in his review of the SSA decision, however, the ALJ never mentioned the notes from Drs. Gomez and Schultz indicating that Campbell's condition had improved as of October and November 2012 and March 2013, and it is unclear whether he even had access to those notes. In any event, as previously noted, the SSA decision is not dispositive in this ERISA case. *See Ray*, 443 F. App'x at 533; *Paramore*, 129 F.3d at 1452 n.5.

Under the LTD policy, Campbell would have been entitled to LTD benefits commencing on or about February 16, 2012, when his 90-day elimination period ended. Based on the evidence in the ERISA administrative record, the court concludes that Campbell was entitled to some LTD benefits, but not beyond October 2012, when the medical records reflect that his condition had improved. Again, the critical inquiry is "whether a reasonable basis existed for the administrator's benefits decision," *Blankenship*, 644 F.3d at 1355, and as long as a reasonable basis appears for the decision, "it must be upheld as not being arbitrary

and capricious, even if there is evidence that would support a contrary decision."
*Jett*, 890 F.2d at 1140.  For the reasons discussed above with respect to United of
Omaha's STD determination, the court finds that no reasonable basis existed for
United of Omaha to deny all LTD benefits to Campbell, as the evidence from his
doctors reflects that he suffered from neurocognitive deficits and memory
impairment following his stroke sufficient to prevent him from performing the
essential functions of his job for an extended period of time beyond February 16,
2012, and as the efforts of Dr. Bress (and United of Omaha's nurses) to discredit
that evidence were not persuasive.   As of October 2012, however, United of
Omaha certainly had a reasonable basis to deny any further LTD benefits to
Campbell, in light of his own self-reporting that he was doing well coupled with
Dr. Bress's opinion that he was capable of performing full-time light work.

For these reasons, the court determines that Campbell's motion for
summary judgment on his claim for LTD benefits is due to be granted to the extent
he seeks LTD benefits through October 2012, but denied to the extent he seeks
LTD benefits beyond October 2012.[14]  Conversely, the Defendants' motion for
summary judgment on Campbell's claim for LTD benefits is due to be denied to
the extent Campbell seeks LTD through October 2012 and granted to the extent
Campbell seeks LTD benefits beyond October 2012.

---

[14] This is the last benefits month (R. 316) in which payments would be due in view of the
evidence, particularly Dr. Gomez's progress notes of October 4, 2012.  (R. 414-16).

**E.      Campbell's Request for Equitable Relief**

In Campbell's motion for summary judgment and supporting brief, Campbell asks for equitable relief in addition to benefits.  In both his motion and his brief, he requests an order removing United of Omaha as a fiduciary and an order compelling the Plan and its fiduciaries to adhere to ERISA's regulatory provisions and the Plan terms in the future.  (Doc. 23 at 2; Doc. 26 at 30).  The court, however, previously granted the Defendants' motion to dismiss Campbell's equitable claims and dismissed those claims with prejudice.  (Docs. 14 & 15). Moreover, other than simply requesting the equitable relief, Campbell has not shown why he would be entitled to such relief.  Accordingly, to the extent Campbell's motion for summary judgment requests equitable relief, the motion is denied.

## IV.  CONCLUSION

For all of the foregoing reasons, the Defendants' motion for summary judgment (doc. 20) is due to be granted in part and denied in part; Campbell's motion for summary judgment (doc. 23) is due to be granted in part and denied in part; and the Defendants' motion to exclude certain exhibits and portions of Campbell's response brief (doc. 32) is due to be granted in part and denied in part.

An appropriate order consistent with this opinion will be entered.  The parties will be ordered to calculate the short-term and long-term disability benefits

that have accrued to Campbell premised on the foregoing findings, with interest. Thereafter, Campbell's counsel may make application for reasonable attorney's fees and costs.

**DONE,** this 6th day of October, 2015.

_____

**JOHN E. OTT**
Chief United States Magistrate Judge